1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DIGEO, INC.,

                    Plaintiff,

          v.

AUDIBLE, INC.,

                    Defendant.

CASE NO. C05-464JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on the parties' request for construction of the claim terms at issue in this patent infringement action.  The court has reviewed the parties' briefing and supporting materials, and has heard oral argument at a February 27, 2006 Markman hearing.  This order memorializes the court's claim construction.

## II.  BACKGROUND

Plaintiff Digeo, Inc. ("Digeo") is the assignee of United States Patent No. 5,734,823 (the "'823 Patent"), which covers a system for distributing electronic information from a central information bank to units on a network.  Defendant Audible, Inc. ("Audible") distributes audio media content over the internet.  Digeo claims that Audible's distribution system infringes the '823 Patent.

Because the prosecution history of the '823 Patent figures prominently in the parties' claim construction arguments, the court summarizes it here.  The '823 Patent's

ORDER – 1

oldest parent is United States Patent Application No. 07/787,536 (the "'536 Application"). Michael Saigh was the sole inventor listed on the application, which he filed in November 1991. He eventually abandoned the application.

In August 1994, Mr. Saigh filed a continuation of the '536 Application, United States Patent Application No. 08/296,120 (the "'120 Application").[1] After another continuation, the '120 Application issued as United States Patent No. 5,734,891 (the "'891 Patent"), which is not at issue in this action. The '891 Patent focused on a "personal library apparatus," a device that a user could employ to receive information from the information distribution network. The '891 Patent issued on March 31, 1998, the same date as the '823 Patent.

In December 1994, three other inventors joined Mr. Saigh in filing United States Patent Application No. 08/367,056 (the "'056 Application"), a continuation-in-part of the '120 Application. The inventors rewrote the specification when they submitted the '056 Application. Whereas the '120 Application focused on the user's device for receiving and storing content from the information network, the '056 Application focused on the network itself.

The four inventors abandoned the '536 Application and filed a continuation in July 1996, United States Patent Application No. 08/687,292 (the "'292 Application"). The '292 Application issued as the '823 Patent on March 31, 1998.

---

[1]The first page of the '823 Patent refers to the '120 Application as a "continuation-in-part," an assertion at odds with the '120 Application and the '891 Patent. The court notes that the '120 Application uses the written description from the '536 Application without adding new matter, indicating that it is a continuation, not a continuation-in-part. See Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1579 (Fed. Cir. 1996) (Mayer, J., concurring) (differentiating continuations from continuations-in-part).

ORDER – 2

In the first step toward determining whether the '823 Patent is valid and whether Audible infringed it, the court must now construe the disputed patent terms.

### III.  ANALYSIS

Almost ten years ago, in <u>Markman v. Westview Instruments, Inc.</u>, the Supreme Court placed sole responsibility for construing patent claims on the court.  517 U.S. 370, 372 (1996).  The Federal Circuit later established that the court construes claims purely as a matter of law.  <u>Cybor Corp. v. FAS Tech., Inc.</u>, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (applying de novo review to all claim construction issues, even "allegedly fact-based questions").  Executing the <u>Markman</u> mandate requires a court to interpret claims after giving the appropriate level of consideration to various sources of evidence.

Intrinsic evidence, which includes the patent and its prosecution history, is the primary source from which to derive a claim's meaning.  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  A patent is composed of three parts:  (1) a "written description," an often lengthy exposition of the background of the invention, at least one embodiment of the invention, and other written material that assists in understanding how to practice the invention; (2) (in most cases) a set of drawings that illustrates portions of the written description; and (3) the claims, which delimit the scope of the invention.  <u>General Foods Corp. v. Studiengesellschaft Kohle mbH</u>, 972 F.2d 1272, 1274 (Fed. Cir. 1992).  Together, these three components make up the patent's "specification."[2]  <u>Atmel Corp. v. Information Storage Devices, Inc.</u>, 198 F.3d 1374, 1384 (Fed. Cir. 1999); 35 U.S.C. § 112.

---

[2]Although 35 U.S.C. § 112 includes the claims as part of the specification, many courts and practitioners use the term "specification" to refer to all portions of a patent except the claims.  In most instances, the context will reveal what portion of the specification is at issue.

ORDER – 3

The prosecution history exists independently of the patent. It consists of the inventor's application to the United States Patent and Trademark Office ("PTO") and all correspondence between the PTO and the inventor documenting the invention's progress from patent application to issued patent. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In its review of intrinsic evidence, the court begins with the language of both the asserted claim and other claims in the patent. Phillips, 415 F.3d at 1314; Biagro Western Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("It is elementary that claim construction begins with, and remains focused on, the language of the claims."). The court's task is to determine the "ordinary and customary meaning" of the terms of a claim through the eyes of a person of ordinary skill in the art on the filing date of the patent. Phillips, 415 F.3d at 1313 (quoting Vitronics, 90 F.3d at 1582). Sometimes, the ordinary meaning is "readily apparent even to lay judges," in which case claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314.

The court must read claim language, however, in light of the remainder of the specification. Id. at 1316 ("[T]he specification necessarily informs the proper construction of the claims."). In cases where the ordinary meaning of a claim term seems apparent from its use in the claim, the court must consult the specification either to confirm that meaning or to establish that the inventor intended a different meaning. Superguide Corp. v. DirecTV Enters., Inc., 358 F.3d 870, 875 (Fed. Cir. 2004). If the ordinary meaning is not apparent from its use in the claim, the court looks to the specification to provide meaning. Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999). The specification acts as a "concordance" for claim terms, and is thus the best source beyond claim language for understanding claim terms.

ORDER – 4

Phillips, 415 F.3d at 1315.  The inventor is free to use the specification to define claim terms as she wishes, and the court must defer to an inventor's definition, even if it is merely implicit in the specification.  Id. at 1316 ("[T]he inventor's lexicography governs."), 1320-21 (noting that a court cannot ignore implicit definitions).  The court should "rely heavily" on the specification in interpreting claim terms.  Id. at 1317.

When the court relies on the specification, however, it must walk a tightrope between properly construing the claims in light of the written description and the "cardinal sin" of improperly importing limitations from the written description into the claims.  SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001); Phillips, 415 F.3d at 1323 (citing Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186-87 (Fed. Cir. 1998)).  A patentee often describes examples or "embodiments" of his or her invention in the written description, but courts may not limit the invention to an embodiment absent clear evidence that a patentee "intends for the claims and the embodiments . . . to be strictly coextensive."  Phillips, 415 F.3d at 1323.

Although a patent's prosecution history is also intrinsic evidence, it is "less useful for claim construction purposes," because it usually "lacks the clarity of the specification."  Id. at 1317.  The prosecution history is useful, however, in determining if an inventor has disavowed certain interpretations of his or her claim language.  Id.

Finally, the court can consider extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises."  Id. (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995)).  Extrinsic evidence is usually "less reliable than the patent and its prosecution history" as a source for claim interpretation.  Id. at 1318.  The court thus need not admit extrinsic evidence, but may do so in its discretion if intrinsic evidence does not disclose the meaning of a claim term.  Id. at

ORDER – 5

1319; Vitronics, 90 F.3d at 1583 ("[W]here the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.").

In this case, the court has considered the parties' extrinsic evidence but declines to rely on it.  The parties have asserted two kinds of extrinsic evidence:  dictionary definitions of claim terms and expert testimony.  For each disputed claim term, the intrinsic evidence is sufficient to either confirm that the inventors used the term in its ordinary sense or to reveal the precise departure from the ordinary meaning that the inventors intended.  The court will not discuss the dictionary definitions of these claim terms, consistent with the Phillips court's recognition that it is not necessary to do so. 415 F.3d at 1318-19.  For similar reasons, the court will not rely on the parties' experts in construing the claims.  See Trilogy Communications, Inc. v. Times Fiber Communications, Inc., 109 F.3d 739, 744 (Fed. Cir. 1997) ("When . . . the patent specification and the prosecution history adequately elucidate the proper meaning of the claims, expert testimony is not necessary and certainly not crucial.").  The intrinsic evidence provides an ample basis for interpreting the disputed terms of the '823 Patent.

With this general framework in mind, the court turns to the claim terms in dispute.

**A.    "Communicatively Coupled" Means "Connected in a Way that Permits Communication."**

      **1.    Ordinary Meaning**

The term "communicatively coupled," which appears in asserted Claims 1, 6, 11, and 17, invariably describes the connection between a central information storage bank (the computer or array of computers that stores the universe of downloadable media content) and local units from which a user can download selected media.  E.g., '823 Patent Claim 1 ("at least one local unit communicatively coupled to said central

computer"); Claim 19 (same); Claim 6 ("a first interface to be communicatively coupled to the central computer"). The ordinary meaning of the term "coupled" is "connected," and the adverb "communicatively" suggests that the coupling is for the purpose of communication.

Digeo proposes a construction of "communicatively coupled" that reflects the term's ordinary meaning. Audible, however, contends that the term is limited to couplings on an "integrated closed network." At oral argument, Audible explained that an "integrated closed network" is a network that only preauthorized users can access. Audible does not contend that the "integrated closed network" limitation is inherent in the plain meaning of "communicatively coupled," nor could it. Audible must, therefore, point to evidence of a "clear disavowal of claim scope" through "words or expressions of manifest exclusion or restriction." ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1091 (Fed. Cir. 2003).

## 2. Specification

The claim language and specification provide no support for Audible's proposed construction, much less a "clear disavowal of claim scope" that would mandate a departure from the ordinary meaning of "communicatively coupled." When pressed at oral argument to point to any disclosure of a "closed" network in the specification, Audible suggested that the description of a customer opening an account and obtaining an identification card was evidence that the patent disavows any "open" network. The disclosure, however, simply notes that in a "point of purchase delivery system" embodiment, the customer would obtain an access card before downloading content. '823 Patent at 10:40-11:17. The court is not at liberty to restrict the scope of the claims to conform to the description of an embodiment. Dow Chem. Co. v. Sumitomo Chem. Co., 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("It is axiomatic that claims, not the

ORDER – 7

specification embodiments, define the scope of protection.") (internal citation omitted). Even if the court were to limit the claims in accordance with the point of purchase embodiment, the embodiment does not require a "closed" network. Nothing in the description prohibits a user from accessing content without preauthorization. Authorization is necessary only if the user decides to *purchase* content.

In contrast to the single inapposite disclosure in the specification that Audible identified, the specification repeatedly discloses the use of unrestricted networks over which local units and a central information bank are communicatively coupled:

> Communication network links between the central information bank . . . and point of sale sites can be made utilizing one or a combination of many commercially available networks such as telephone, satellite or cable networks or any other medium suitable for transmitting information in a digitized format.

Id. at 5:21-27. The inventors also stated that one could use the internet as the "backbone" network for the invention. Id. at 5:28-30. The inventors *never* described the communication links between the central information bank and the local units as closed or restricted to preauthorized users. Instead, the means for protecting media content from unauthorized use are the encryption methods that the court will discuss later. See infra Part III.G; '823 Patent at 15:17-28. When the patentees wished to claim encryption methods, they did so by using explicit language covering encryption. The notion that the term "communicatively coupled" is limited to "closed" communication is inconsistent with the '823 Patent's written description and claim language.

### 3.    Are Mr. Saigh's Pro Se PTO Communications Part of the Prosecution History?

The bulk of the support for Audible's proposed construction comes from the prosecution history. Before reviewing the history, however, the court must consider a dispute over whether it may consider certain communications from Mr. Saigh as part of

the prosecution history.  Each of the challenged communications is physically part of the prosecution history, in the sense that each is part of the public record.  Nonetheless, Digeo urges the court to ignore at least some of the communications.  Audible contends that the court cannot ignore them.

The court first reviews the context of the challenged communications.  Mr. Saigh executed a power of attorney during the prosecution of the '120 Application, and a joint power of attorney with the other three inventors on the '056 Application.  PH at 500-244-45 ('120), 500-442-45('056).[3]  Nonetheless, Mr. Saigh submitted "pro se" communications to the PTO on several occasions, in violation of PTO rules.  See Manual of Patent Examining Procedure ("MPEP") § 403.  In response, the PTO took actions suggesting that it ignored the pro se communications.  E.g., PH at 500-321, 500-591.  The PTO also suggested, however, that it substantively considered the communications.  E.g., 500-597 ("Applicant's arguments filed 12/27/95 have been fully considered but they are not deemed to be persuasive."), 500-641 ("Applicant's arguments filed 12/27/95 and 7/25/96 have been fully considered but they are not deemed to be persuasive.").  In the interim, Mr. Saigh purported to revoke the power of attorney.  PH at 500-590.  It is not clear whether the PTO applied the revocation prospectively or retrospectively.  There are other entries that further complicate matters, but the court will summarize the situation succinctly:  the prosecution history with respect to Mr. Saigh's communications is a big mess.

Fortunately, the court need not serve as housekeeper.  The court assumes for the purposes of claim construction that Mr. Saigh's communications are part of the

---

[3]All citations to the prosecution history come from the sequential collection of each application's history.  As each page number begins with "500-," the court will cite individual pages as "PH at 500-nnn," and ranges of pages as "PH at 500-nnn-nnn."

ORDER – 9

prosecution history, and that the court should examine them as it would any other entry in the prosecution history.  It will become apparent that considering Mr. Saigh's communications does not prejudice Digeo.

### 4.    Prosecution History

The fuss over Mr. Saigh's communications with the PTO arises because he made statements that serve, in Audible's view, to sharply limit the scope of the claims, including the scope of the term "communicatively coupled."  In a November 1995 office action, the PTO rejected all claims pending in the '056 Application because a disclosure in the October 1993 issue of the Heller Report (an educational technology newsletter) either anticipated the claims or made them obvious.  PH at 500-572; Culbert Decl. Ex. A.  In addition, the same office action contained a "Notice of References Cited," PH at 500-575, along with a notice that the "prior art made of record and not relied upon is considered pertinent to applicant's disclosure."  PH at 500-573.

Although the PTO had not rejected any claims based on any prior art other than the Heller Report, Mr. Saigh chose to discuss every reference in the "Notice of Prior Art" when he responded to the November 1995 office action.  In a section addressing United States Patent No. 5,221,838 (the "Gutman Patent"), Mr. Saigh offered several bases for differentiating his invention:

> While the Gutman device is to be used in connection with an unrelated network for the transmission of data electronically, *the Applicant Invention represents an integrated closed network* for the electronic transfer of data representing intellectual properties composed of many bytes of data.

PH at 500-581 (emphasis added).

> While the Gutman device is not physically configured to make it suitable for reading or viewing intellectual properties comprised of many bytes of data, *the Applicant invention is a closed network* whose principal purpose would be the electronic transmission of such intellectual properties comprised of many bytes of data.

ORDER – 10

PH at 500-581 (emphasis added).

> While it would be reasonable to assume that the Gutman device will be principally used by the end user to interface with electronic networks or devices of unrelated persons to receive, store and transmit data related to the user electronically, [sic][4] *Most likely, the Applicant invention would represent a closed integrated network* for the transfer of intellectual properties for the creator or owner to one or more persons desiring to purchase or lease the use of the data being transferred.

PH at 500-582 (emphasis added).  Audible contends that these disclosures limit the scope of the claimed invention, and the term "communicatively coupled," to communication over a "closed integrated network."  Audible Br. at 13.

Audible seeks to invoke the doctrine of prosecution disclaimer.  See Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1323-25 (Fed. Cir. 2003).  When a patentee has made "clear and unmistakable" statements disavowing claim scope, a court must interpret claims consistently with the disavowal.  Id. at 1326; see also NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1309 (Fed. Cir. 2005) (requiring "words or expressions of manifest exclusion or restriction representing a clear disavowal of claim scope").  Ambiguous disclaimers do not limit claim scope.  See Omega Eng'g, 334 F.3d at 1325-26; see also Sandisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1287 (Fed. Cir. 2005).  A court can limit claim terms by prosecution disclaimer only when the patentee's "arguments to the examiner have no reasonable interpretation other than to disavow" claim scope.  Sandisk, 415 F.3d at 1287.

Mr. Saigh did not clearly and unmistakably disavow claim scope when he used the term "closed integrated network" during prosecution.  Ambiguity pervades his statements.  Mr. Saigh used the phrase, or variations of it, three times.  In the first

---

[4]Mr. Saigh's communications to the PTO often contain typographical or grammatical errors.  The court has attempted to reproduce them faithfully in its citations to the prosecution history.

ORDER – 11

instance, he arguably made a distinction giving meaning to the phrase "integrated closed network," but it is not the distinction or meaning that Audible urges. The Gutman Patent describes a handheld "Electronic Wallet" used to conduct consumer transactions electronically. When Mr. Saigh described his invention as " an integrated closed network," he was distinguishing it from the "unrelated network" over which the Gutman wallet would transmit data. PH at 500-581. Beyond the semantic difference between the phrases, it is unclear what distinction Mr. Saigh sought to draw. The court finds no basis, however, to conclude that he was limiting his invention to networks in which all access is preauthorized, much less that he did so clearly and unmistakably.

In the remainder of Mr. Saigh's effort to distinguish the Gutman Patent, the phrases "closed network" and "closed integrated network" most likely carry the same meaning as they did in the instance the court described above. Mr. Saigh noted that the Gutman device was not suitable for "reading or viewing intellectual properties composed of many bytes of data," and stated that his invention is a "closed network whose principal purpose" is to allow transmission of many bytes of data. PH at 500-581. Mr. Saigh thus distinguished the amount of data the two inventions were meant to transport; he imparted no additional meaning to the term "closed." Similarly, in noting that the Gutman wallet connected the "end user" to "unrelated persons," whereas his invention "represent[ed] a closed integrated network" for transfer between content owners and persons desiring to purchase or lease the content, PH at 500-581-82, Mr. Saigh distinguished his invention in a manner consistent with his initial use of the term "closed integrated network." The court therefore assumes that Mr. Saigh used the term as he had previously, to distinguish the "unrelated network" on which the Gutman wallet operates.

Audible contends that Mr. Saigh described his invention as operating on an "open-ended" network in the '120 Application, suggesting that his later adoption of the

ORDER – 12

phrase "integrated closed network" was significant.  The use of the term "open-ended,"
however, only injects more ambiguity into the prosecution history.  In distinguishing a
prior art reference, Mr. Saigh noted that the "system described in the [prior art] is a
closed network, in that, for the most part, the system will be housed and operated within
the same vicinity or building."  PH at 500-332.  By contrast, he deemed his invention an
"open ended network," because "the data may be flowing into and out of the network
from many diverse locations many of which may be quite far from each other (they
could be half a world away)."  Id.  Mr. Saigh made the same distinction in discussions of
at least two other pieces of prior art.  PH at 500-340, 500-343.  Following Audible's
logic, when Mr. Saigh later allegedly limited his invention to a "integrated closed
network," he disavowed the practice of the invention on any network except one housed
"in the same vicinity or building."  Such a limitation is preposterous in light of the
specification and the claims.  Indeed, the illustration on the first page of the '823 Patent
shows a network operating across the United States.

In examining another prior art reference in the prosecution of the '120
Application, Mr. Saigh declared that it did not matter whether his invention operated on
a closed or open network.  PH at 500-337 ("The Saigh Patent System *could be* operated
as part of an open access system or network or a closed computer system or network.")
(emphasis added).  This is consistent with the later entry in the prosecution history on
which Audible urges the court to rely.  PH at 500-582 ("*Most likely*, the Applicant
invention would represent a closed integrated network for the transfer of intellectual
properties . . .") (emphasis added).

Mr. Saigh's pro se contributions exemplify the Federal Circuit's observation in
Phillips that the prosecution history "often lacks the clarity of the specification and thus
is less useful for claim construction purposes."  415 F.3d at 1317.  The court can only

ORDER – 13

speculate about why Mr. Saigh addressed the Gutman Patent at all, given that the PTO had not rejected any claims in light of it.  In addressing the Gutman Patent, he may or may not have used variations of the phrase "integrated closed network" to make a distinction, but that distinction is murky at best.   The court has noted that his references are subject to numerous interpretations.  Audible cannot prevail merely by offering its best interpretation of Mr. Saigh's statements, even if its interpretation is reasonable.  Audible must show that Mr. Saigh clearly and unambiguously disavowed the practice of his invention on any network except one that required preauthorization before accessing it.  It has not met that burden here.

For these reasons, the court interprets the term "communicatively coupled" consistent with its ordinary meaning and the specification of the '823 Patent.  The term means "connected in a way that permits communication."

**B.    A "Local Unit" is "an Element of the Network Separate from the Central Information Bank."**

The term "local unit" appears in asserted claims 1, 3, 11, 15, 17, 19, and 23.  In each of the claims, the "local unit" is the unit that is "communicatively coupled" to the central information bank.  The central information bank is presumptively at a distance from the end user, whereas the "local unit" is close to the user, because it is the device from which he or she can download content from the system.  In this context, the ordinary meaning of the term "local unit" is a unit that is a member of a network that includes a central information bank, but is more "local" to the user than the central information bank.  Again, Digeo's proposed construction reflects the ordinary meaning.  Again, Audible proposes a construction divorced from the ordinary meaning:  "a self-service user interactive information vending device, such as a kiosk or book bank."  Audible Br. at 15.

ORDER – 14

Although the specification does not use the term "local unit," it uses the words "unit" and "local" in a manner consistent with the ordinary meaning noted above. A "unit" is simply an element in the network. Sometimes it is an element contained within a larger element. <u>E.g.</u>, <u>id.</u> at 2:52-53 (disclosing a "central processing unit contained within the Book Bank"); 7:43-45 (disclosing a central processing unit in a fileserver). In other instances, a "unit" may be a stand-alone element. <u>E.g.</u>, <u>id.</u> at 14:9-10 (disclosing a separate "memory storage unit"); <u>id.</u> at 14:35-41 (disclosing promotional units).

The adjective "local" usually refers to a capability or feature contained within something, as opposed to a capability or feature that it must get from another unit or system. In this vein, the patent discusses a "customer service terminal" with "local processing capability," <u>id.</u> at 7:33-34, and a "Book Bank" that contains "local memory storage," <u>id.</u> at 2:44-45. In other disclosures, the specification uses "local" to refer to areas away from the central hub of a system. <u>E.g.</u>, <u>id.</u> at 7:65-67 (discussing how external "network systems such as institutional or corporate network systems with local merchants terminals" can be coupled to the network).

The "local unit" of the asserted claims is a unit with particular capabilities that the surrounding claim language describes explicitly. In Claim 1, for example, the local unit must be communicatively coupled to the central computer, and it must include memory for storing information from the central computer, as well as a processor for transferring the stored information to a user's storage media. The local unit must also be configured to dynamically encrypt information.

Despite these explicit limitations, Audible insists that the term "local unit" contains implicit limitations as well. Audible focuses on the "Book Bank," which the specification describes as the "interface between the network and the user," <u>id.</u> at 2:37-38, and explains that it is a "self-service, user interactive information vending device."

ORDER – 15

Id. at 2:43-44.  In "one embodiment," the Book Bank is housed in a kiosk that permits an in-store user to select and purchase media content.  Id. at 8:14-38 & Fig. 5.  The in-store kiosk is merely an embodiment of a local unit, and the court declines Audible's invitation to treat it as a limitation on the term.  See Dow Chem., 257 F.3d at 1378.  The specification's description of the Book Bank as a "self-service, user interactive information vending device" is not meant to limit the term "local unit," but rather to illustrate a local unit in accordance with the claims.  Even if the court agreed that the Book Bank is the only embodiment of a local unit in the specification, the Federal Circuit has "expressly rejected" the notion that the court must construe the term in accordance with a single embodiment.  Phillips, 415 F.3d at 1323.  Patentees are encouraged to use examples to illuminate their claims.  See id. ("[I]t is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.").  Absent a clear disavowal of full scope of "local unit," the court declines to penalize the inventors of the '823 Patent for providing an example of their invention that is not as broad as the scope of the patent.

For these reasons, the court construes the term "local unit" as "an element of a network separate from the central information bank."

**C.    "Electronic Storage Media" is "Memory Configured to Store Information in a Format that an Electronic Device Can Read" and "Storing, in Electronic Form, Information" Means "Storing Information in a Format that An Electronic Device Can Read."**

The terms "electronic storage media" and "storing, in electronic form, information" appear in asserted claims 1, 3, 6, and 19.  In each of these claims, the unit in communication with the central information bank contains a "memory for storing, in electronic form, information transmitted to" the unit from the central information bank.

ORDER – 16

The unit in turn is configured to transfer information to the "electronic storage media" of system users.  The parties' proposed definitions are equivalent – both agree that the terms refer to the storage of information in an electronic format.  The parties disagree sharply, however, over the meaning of "electronic."  Digeo contends that "electronic" is a generic term that covers a wide variety of storage media, including but not limited to computer hard drives, floppy disks, magnetic tapes, and compact disks.  Audible contends that "electronic," as it is used in the claims, covers only memory that stores information in the form of "electrical signals," and excludes all other memory, including magnetic memories (such as hard disks, floppy disks, and magnetic tapes) and optical memories (such as compact disks).

Digeo's interpretation of the term "electronic" seems to the court to be consistent with the ordinary meaning of the term and its use in the claim language.  Audible's interpretation seems strained, but as the court is not of skill in the art of networked information systems, the court looks to the specification to illuminate the ordinary meaning.

The court finds the specification inconsistent with Audible's narrow interpretation.  The patentees were aware of a broad range of storage mediums, including "tapes, diskettes, cartridges, laser disk[s]," and "compact disk[s]."  '823 Patent at 1:22-23.  In a list of storage mediums on which publishers might provide content for the invention, the patentees mentioned "magnetic or electronic disks, cartridges, or tape reels or compact disks, laser disks, tape cassettes, etc."  Id. at 3:62-63.  Audible seizes upon the first "or" in the phrase, insisting that the patentees drew a distinction between "magnetic" media and "electronic" media.  In Audible's view, because the patentees only claimed "electronic" media, they surrendered all else.

ORDER – 17

In its briefs, Digeo contended that Audible's interpretation of "electronic storage media . . . would exclude any known computer-readable storage device."  Digeo Reply Br. at 11.  When the court echoed that concern at oral argument, Audible responded with a 12-page supplemental brief (Dkt. # 41) with extrinsic evidence showing that there is a species of media that is electronic, but not magnetic or optical, and that this species was known in the art during the prosecution of the '823 Patent.  With apologies to Shakespeare, the court finds that Audible doth protest too much.  The question is not whether specialized "electronic" media existed, but whether the patentees intended to limit the practice of their invention solely to such media.  If they had so intended, one would expect the specification to indicate this choice with something other than a single ambiguous use of the word "or."  If the patentees had so intended, one would expect the intrinsic evidence to contain a reference to the specialized "electronic" media.  If the inventors intended to exclude the most common storage mediums (i.e., hard disks, floppy disks, and compact disks), the court expects that the inventors would have said so.

Moreover, the claims themselves suggest that the patentees were not concerned with specialized "electronic" media.  Although several claims refer to the end user's media as "electronic storage media," e.g., Claims 1-5, several others refer simply to "storage media," e.g., Claims 11-14, 17-18, whereas others use the term "memory unit," e.g., Claims 6-10, 27, 29-30.  In Claim 19, the inventors simultaneously claimed the more general "storage media" with the supposedly more specific "electronic storage media."  In claims depending from Claim 19, the patentees continued to switch between the two terms without explanation.  If the court were to follow Audible's logic, it would be forced to conclude patentees sometimes chose to exclude a vast array of media, and

ORDER – 18

sometimes did not, and did so with no explanation whatsoever.  The court finds this implausible.

Audible also points to the prosecution history in support of its proposed construction, but again asks the court to read too much into the inventors' choice of words.  In a preliminary amendment at the outset of the '292 Application, the patentees inserted the word "electronic" to modify "storage media" in the claims.  PH at 500-618-23.  Nowhere in the history, however, is there a suggestion that the patentees were making a distinction between "electronic" media in the sense that Audible uses the term and other forms of media.[5]  The patentees did not make the distinction in their remarks accompanying the preliminary amendment.  PH at 500-628-33.  The PTO did not acknowledge the distinction in rejecting the preliminary amendment.  PH at 500-638-42.  The patentees did not make the distinction in their response to the rejection.  PH at 500-645-653.  The PTO did not note any distinction when it allowed the claims as drafted in the preliminary amendment.  PH at 500-655-56.  As the court has already noted, there can be no prosecution disclaimer absent a clear and unambiguous disavowal of claim scope.  The court finds no disavowal of claim scope inherent in the patentee's use of the word "electronic."

For the reasons stated above, the court concludes that "electronic storage media" means "memory configured to store information in a format that an electronic device can read," and that "storing, in electronic form, information" means "storing information in a format that an electronic device can read."  The term "electronic" does not exclude magnetic or optical media such as hard drives, floppy disks, or compact disks.

---

[5]Although Audible does not acknowledge it, the patentees used the phrase "storing, in electronic form" in their claims since they filed the '056 Application.  PH at 500-435.  This casts more doubt on Audible's assertion that they surrendered claim scope when they later added the word "electronic" to the claim phrase "storage media."

ORDER – 19

**D.   "Information" means "Anything that Can be Represented in Electronic Form, Including Text, Sound Recordings, and Images."**

Claims 1, 3, 6, 11, 17, and 19 use the term "information." The ordinary meaning of this term is readily apparent, so much so that the best definition the court can give is a tautology. "Information" means "information." Digeo's proposed definition, "anything that can be represented in electronic form, including text, numbers, sound recordings, and/or visual representations," follows the ordinary meaning and adds the limitation that the information be of the sort that one can represent in an electronic format. Audible does not argue that the ordinary meaning of the term is different, but insists that the patentees limited the claimed "information" to "content that is obtained from a publisher and that is visually perceived by a user." Audible's proposed construction presents two questions for the court: whether the invention covers only information that a user can see, and not information that a user can hear; and whether the claimed "information" is solely information that comes from a content publisher?

**1.   Did the Patentees Limit Their Claims to Visual Information?**

The specification contradicts Audible's claim that the '823 Patent covers only visually perceptible information. In describing the "Book Bank" unit in the system, the inventors explained that "[a]lthough the term Book Bank may imply 'book-type' material, such term is not so limited. The material may be of many types, such as movies, music, video, audio, and computer software material." '823 Patent at 2:37-42. Nothing in the remainder of the specification suggests that the inventors reversed course and limited their invention to visually perceptible information.[6]

_____

[6]Although it is not dispositive of the issue, the court notes that the end user device that the '891 Patent covers contains a set of headphones. '891 Patent, Figs. 1-2. Headphones would be an unusual accessory if the patented system from which the device is to obtain information did not transmit information that a user could experience audibly.

ORDER – 20

Again, Audible relies on the prosecution history to provide what the specification does not. In a December 1995 pro se communication, Mr. Saigh stated that his invention "relates to the transmission, storage, and encryption of the software instructions and codes that will generate a visual image upon the monitor of the user reading device . . . ." PH at 500-585. Had Mr. Saigh been distinguishing his invention from a prior art reference relating to audible information, the court might accept his statement as evidence of a surrender of claim scope. Instead, he was distinguishing a reference that described a "Visual Interface for Retrieval of Electronic Formed Books." PH at 500-584. Audible also notes that Mr. Saigh described his invention as a "network designed for the electronic transmission of intellectual properties . . . to one or more end users with the data to be viewed by the user . . . ." PH at 500-586. Once again, Mr. Saigh was distinguishing his invention over a reference describing electronic books, PH at 500-585, leaving the court with no basis to conclude that he was disclaiming coverage for non-visual information.

### 2. Did the Patentees Limit Their Claims to Information Acquired from Publishers?

The '823 Patent contains countless references to information of many types. One type is the media content (i.e., the "movies, music, video, audio, [or] computer software material" disclosed in Column 2) that publishers provide for distribution over the patented system. Another type is transactional information, including information related to the number of times a user copies an item on the network (e.g., Claim 7), information related to the length of time in which a user accesses an item from the network (e.g., Claim 14), and "information related to transactions performed by" the first unit of the local unit (Claim 11). Still another type is information stored on the user's storage media that assists in encrypting information. Claim 3 (disclosing a "local

ORDER – 21

unit further configured to utilize information stored on the electronic storage media to encrypt information").[7]  The specification contains numerous disclosures of each of these types of information.

Each of the foregoing examples illustrates that when the patentees wished to limit "information" to information of a particular type, they did so by including explicit language in the claim.  Where claims cover solely transactional or encryption-related information, the limitation is unambiguous.  But in discussing the "information" to be sent from the network to the user's storage media, the patentees included no restriction limiting that information to information obtained from the publisher.  For that reason, the court finds no basis for limiting the generic term "information" to information that comes from a publisher.  See Johnson Worldwide, 175 F.3d at 989 ("[M]odifiers will not be added to broad terms standing alone.").

For the foregoing reasons, the court construes "information" to mean "anything that can be represented in electronic form, including text, sound recordings, and images."

**E.    A "Fileserver" is "a Networked Device or Program that Manages Access to One or More Separately Stored Files."**

As with the term "communicatively coupled," Audible proposed that the term "fileserver" in Claim 11 is limited to a fileserver that operates over a "closed network."  The court has already addressed that contention.  At oral argument, the parties conceded that there is no other material difference between their proposed definitions.  The court

---

[7]Audible does not seek a construction of the term "information" as it is used to refer to the encryption-related information on the user's storage media.  Audible Br. at 22.  Nonetheless, the court must assume, "unless otherwise compelled," that the same claim term used in the same patent "carries the same construed meaning."  Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir. 2003).

therefore construes the term "fileserver" to mean "a networked device or program that manages access to one or more separately stored files."

**F.      A "Transactional Database" is a "Structured Computer Memory for Storing and Accessing Data Related to Transactions."**

Claim 11 covers a "transactional database."  The specification explains that this database "records and stores information related to each transaction performed at each point-of-sale site," and is capable of "transmit[ting] sales data to a requesting publisher." '823 Patent at 2:7-12.  Because the court finds no material difference between the parties' proposed definitions, it construes the term to mean "a structured computer memory for storing and accessing data related to transactions," as this definition reflects the ordinary meaning of the term and the disclosure of the database in the specification.

**G.      Construing the Encryption-Related Terms**

The terms remaining for construction all relate to encryption technology.  In each claim in which a form of the verb "encrypt" appears, the verb's direct object is "information," and more specifically information transferred to a user's storage media. '823 Patent Claims 1, 3, 6, 17, 19.  As both parties' proposed constructions demonstrate, to "encrypt" information is to alter the information in some way to prevent unauthorized access.  This is consistent with the ordinary meaning of the term.  Both parties agree that altering information by encoding or enciphering it is encryption.  Audible contends that password or access code protection is not "encryption."

At oral argument, Digeo conceded that "encryption" in the patent requires some alteration of the information that the network transfers to the user's storage media.  It also argued, however, that the patent does not specify what "information" must be altered.  As an example, counsel suggested that adding a "key" or "header" to a media

file and then scrambling the key or header during transfer would be a form of encryption.

### 1.   "Encrypt"

The '823 Patent elaborates the meaning of "encrypt" in its discussion of the three levels of encryption it provides.  '823 Patent at 15:18-20.  The first is "pre-transport" encryption of information by publishers before it is placed into the network system.  Id. at 15:19-23.  The second level is encryption by the network before transmitting data to the "book bank" or other local units.  Id. at 15:23-24.  The third level is an encryption process that occurs when information is transferred from the book bank or local unit onto a user's storage media.  Id. at 15:29-31.

The patent devotes little discussion to the first two levels of encryption.  Pre-transport encryption receives no attention.  The second level of encryption, which is the initial encryption that the patented system performs, is intended to "make the data ready for being transmitted with less risk of unauthorized use while being transmitted through a communications network."  Id. at 5:64-66.  The inventors note that "standard available encryption protocols" are available to perform this level of encryption.  Id. at 6:1-3.  The discussion of these "well-known encryption algorithms" shows that encryption is not merely protecting data from access with a password or authorization code.  Id. at 15:59-6:9.  Encryption requires enciphering the information.

The patentees often described the third-level encryption process as "dynamic encryption."  Dynamic encryption is a process that combines disparate sources of authorization into an encryption format that one can only decipher by reproducing the same combination of sources.  The patent describes this concept in several ways:

> A "dynamic" encryption process is utilized so that only the electronic reader associated with the user card used to access the information from

ORDER – 24

the Book Bank and download the information to the user storage cartridge can be utilized to display the information in an understandable text format.

Id. at 4:11-16.

Dynamic encryption refers to the process in which the Book Bank works together with the storage media to perform a proprietary encryption of downloaded data.

Id. at 15:18-20.

Specifically, [dynamic encryption ensures that] data storage medium accessible from one reader/computer will not be accessible using another reader/computer unless such access has been prearranged . . . .

Id. at 15:53-58.

The patent provides a single example of how to implement a dynamic encryption system, although it notes that many other methods are available. Id. at 16:10-12. The example provides for numbering the letters of the alphabet from 1 to 26, and then "shifting" each number a fixed number of spaces based on the last digit of a serial number electronically embedded in the user's storage media. Id. at 16:12-43. The user's password is then converted to a number that dictates intervals at which the code is re-shifted. Id. at 16:43-67. No one could decode the resulting data without both the user's password and the last digit of the electronic serial number from the user's storage media.

The court notes that although the asserted claims of the patent are focused on the final level of encryption, that encryption process need not be the dynamic encryption process described above. Under the doctrine of claim differentiation, the court must construe an independent claim to avoid nullifying claims that depend from it, unless there is compelling evidence for a nullifying construction. Liebel- Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004) ("[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not

ORDER – 25

found in the independent claim."). Claim 1 requires a local unit "configured to encrypt" information at time of transfer to a user, whereas Claim 3, which depends from Claim 1, requires that the local unit be "further configured to utilize information stored on the electronic storage media to encrypt," which is the defining feature of the "dynamic encryption" illustrated in the patent. '823 Patent at 15:14-16 ("Dynamic encryption refers to the process in which the Book Bank works together with the storage media to perform a proprietary encryption of the downloaded data."). Thus, if Claim 1 required the dynamic encryption method exemplified in the written description, then Claim 3 would be at least partially redundant. The court concludes that the bare term "encrypt" is not coextensive with "dynamic encryption."

The patent's discussion of encryption reveals that while an encryption process can employ a password, it must ultimately encode information, not merely create a barrier to accessing the information. A process that merely required a password without altering information would not encrypt information. The patent claims do not, however, specify a particular type of "information" to be encoded, see supra Part III.D, and the court finds no basis in the intrinsic evidence for imposing such a limitation. The court therefore construes the term "encrypt" to mean "to encipher or encode by altering information."

### 2.    "Configured to Encrypt"

The parties also seek an interpretation of "configured to encrypt." The ordinary meaning of this phrase is "capable of encrypting." The specification reinforces this meaning when it notes that the invention's "delivery systems have the *capability* of performing dynamic encryption of data as the data is downloaded onto a user's storage media." Id. at 15:11-13 (emphasis added). Audible suggests that encryption is mandatory, but the court finds no support for that contention in the intrinsic evidence.

ORDER – 26

As Digeo noted at oral argument, it might be preferable to encrypt all data transferred to an end user, but nothing in the patent requires it. "Configured to encrypt" means "capable of encrypting."

### 3.   "Encryption Means for Dynamically Encrypting"

Finally, the court must construe the term "encryption means for dynamically encrypting information" in Claim 6. Because the term contains the phrase "means for," there is a rebuttable presumption that it is in the "means-plus-function" format of 35 U.S.C. § 112. Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1361 (Fed Cir. 2004). Although Digeo refuses to concede that "encryption means for dynamically encrypting" is in means-plus-function format, it also fails to provide evidence to rebut the presumption. The court must therefore construe the term under 35 U.S.C. § 112.

Once a court has identified a means-plus-function claim, it must clarify what function the term recites, and then must hunt in the specification for "structure" that fulfills the stated function. Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999). A court must interpret a means-plus-function claim to encompass "all structure in the specification corresponding to that element and equivalent structures." Id.

In this case, the function is "dynamically encrypting" information, and the corresponding structure is structure to implement the only dynamic encryption scheme that the patent describes. The dynamic encryption method is the multi-tiered alphabet shifting approach described in the specification from Column 16 line 10 to Column 17 line 27. The term "encryption means for dynamically encrypting" therefore means "structure (most likely software) for implementing the dynamic encryption method described from Column 16 line 10 to Column 17 line 27, and its equivalent structures."

ORDER – 27

## IV.  CONCLUSION

Now that claim construction has concluded, the parties' next task is to exchange expert reports on infringement and invalidity issues.  Under the court's current scheduling order (Dkt. # 14), the date for exchanging these reports is April 14, 2006. The court extends that date to April 26, and extends the date for rebuttal reports to May 26.  All other dates set forth in the scheduling order shall remain the same.

Because the construction of these claims did not necessitate reliance on extrinsic evidence, the court DENIES as moot Audible's motion to exclude the expert testimony of Dr. John Strawn (Dkt. # 35).

Dated this 27th day of March, 2006.

_____
JAMES L. ROBART
United States District Judge

ORDER – 28